**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT BARKUS, JR., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 15-704 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| TROOPER BRIAN KNIRNSCHILD, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Pending before the Court is the Motion for Summary Judgment filed by Defendants,
Pennsylvania State Trooper Brian Knirnschild ("Trooper Knirnschild"), Daniel Herr
("Sergeant Herr"), Kenneth Walker ("Trooper Walker"), Trooper John Doe and Officer John
Doe. (Doc. 44). Plaintiffs are Robert Barkus, Jr. ("Mr. Barkus"), individually and as
administrator of the estate ("the Estate") of Kristopher Barkus ("Decedent"); Pamela Barkus
("Mrs. Barkus"); and Robert Barkus III ("Bobby Barkus"). (See 2d Am. Compl., Doc. 26, ¶ 4).
Defendants request judgment on all of Plaintiffs' claims, which include:

> Count I − Violation of the Fourth Amendment (Excessive Force and Seizure Without
> Probable Cause), by the Estate and against Trooper Knirnschild;
>
> Count II − Violation of the Fourteenth Amendment (Invasion and Harm to Bodily Integrity),
> by the Estate against Trooper Knirnschild;
>
> Count III − Wrongful Death, by the Estate against Trooper Knirnschild;
>
> Count IV – a "Survival Action" (alleging Assault, Battery, False Arrest, Intentional Infliction
> of Emotional Distress, Negligence and Negligent Infliction of Emotional
> Distress), by the Estate against Trooper Knirnschild;

Count V − Violation of Fourth Amendment (Seizure Without Probable Cause),
     by Bobby Barkus against the remaining Defendants;

Count VI − False Arrest/Imprisonment, by Bobby Barkus against the remaining Defendants;

Count VII − Civil Conspiracy, by all Plaintiffs against the remaining Defendants;

Count VIII − Intentional Infliction of Emotional Distress, by Bobby Barkus against Trooper
     Knirnschild; and

Count IX − Negligent Infliction of Emotional Distress, by Bobby Barkus against Trooper
     Knirnschild.

(Doc. 26).

In response to Defendant's Motion, Plaintiffs concede that the Fourteenth Amendment

claim (Count II) is subject to dismissal, because subjection to deadly force properly is analyzed

under the Fourth, not the Fourteenth, Amendment.  (Doc. 52 at 18).  Otherwise, Plaintiffs

contend that genuine issues of material fact preclude the entry of summary judgment.

(See Doc. 53, ¶ 1).

For the reasons that follow, Defendants' Motion will be granted as to the Fourth

Amendment claim (Count I), but only to the extent that it is premised on Trooper Knirnschild's

initial shooting of Decedent, and not after; granted as to Count II (as discussed *supra*); granted as

to Bobby Barkus's false arrest/imprisonment claim (Count VI); granted as to the civil conspiracy

claim (Count VII); and otherwise denied.

## **BACKGROUND**

Unless otherwise noted, the following facts are undisputed or construed in a light most

favorable to Plaintiffs.

## A. The Events of May 13, 2014

This case centers on the fatal shooting of Decedent (at times, "Kristopher") by Trooper Knirnschild on June 6, 2014. (Doc. 45, ¶ 1; Doc. 51, ¶ 1). To understand that day's events, it is necessary to detail the first time Kristopher, who lived four-houses down from Trooper Knirnschild on "September Drive," encountered Defendant, on May 13, 2014. (Doc. 45, ¶¶ 2, 5, 6; Doc. 51, ¶¶ 2, 5, 6).

That day, Defendant answered the door and found Kristopher holding open the screen door to Defendant's house. (Doc. 46-1 at tr. pgs. 30-31). Defendant recalls that Kristopher asked to be taken to jail, and he asked Defendant to see if there were any outstanding warrants for him. (Doc. 45, ¶ 7; Doc. 51, ¶ 7). Kristopher took from his bag an identification card (it turned out to be the identification card of his brother, Bobby Barkus) and handed it to Defendant. (Id.; Doc. 46-1 at tr. pgs. 31-32). When Kristopher opened the bag, Defendant noticed that there were several bottles of prescription medication in it. (Doc. 45, ¶ 7; Doc. 51, ¶ 7; Doc. 46-1 at tr. pg. 31). Defendant told Kristopher to sit on his porch-stairs while he called dispatch, and Kristopher complied. (Doc. 51, ¶ 85; Doc. 54 at pg. 28 of 45).

Defendant checked the state police dispatch for warrants using the identification card given to him by Kristopher (i.e., Bobby Barkus's card). (Doc. 45, ¶ 8; Doc. 51, ¶ 8). Defendant discovered that there were no outstanding warrants, returned to the porch where Kristopher was sitting and explained that there was no reason for Kristopher to go to jail. (Id.). Kristopher responded that he lived a few houses away; he had come because he saw Defendant's patrol car in the driveway; Kristopher's family had kicked him out; and he had no money, phone, *et cetera*, and no place to go. (Doc. 45, ¶ 10; Doc. 51, ¶¶ 10, 88). Defendant told Kristopher he had to leave, he could not stay at Defendant's house and he did not want Kristopher on his property.

(Doc. 45, ¶ 8 Doc. 51, ¶ 8). Kristopher complied and began to leave. (Doc. 51, ¶ 89; Doc. 54 at pg. 30 of 45). As Kristopher left, he turned and asked Trooper Knirnschild, "what if I wanted to hurt myself." (Doc. 45, ¶ 9; Doc. 51, ¶ 9). Kristopher then said he didn't want to hurt himself, and left. (Id.). Kristopher's overall demeanor throughout the exchange with Trooper Knirnschild was generally compliant, but also "[very] strange." (Doc. 51, ¶ 90; Doc. 54 at pg. 30 of 45).

Defendant had been off-duty when Kristopher came to his house. (Doc. 45, ¶ 10; Doc. 51, ¶ 10). Once Trooper Knirnschild was on duty, at approximately midnight, he and his partner went to Kristopher's home. (Id.). They went because, due to all the medication bottles in Kristopher's book bag, Defendant believed he "was either drug[-]dependent or having some sort of issues." (Id.; Doc. 46-1 at tr. pg. 34) They entered through an open garage-door (it had been left open so that Kristopher would have access to food and shelter) and knocked on an interior door. (Doc. 45, ¶ 11; Doc. 51, ¶ 11; Doc. 54 at pgs. 44-45 of 45). Kristopher's brother, Bobby Barkus, opened the door, armed with a handgun. (Doc. 45, ¶ 11; Doc. 51, ¶ 11). The troopers cleared the weapon and asked to speak with Kristopher's father. (Id.). Bobby woke his father, who then spoke with the troopers. (Doc. 45, ¶ 11; Doc. 46-3 at tr. pg. 31; Doc. 51, ¶ 11). Mr. Barkus stated that Kristopher suffered from mental health problems, he was on medication, was depressed and had anxiety, but was not violent. (Doc. 26, ¶¶ 27-28; Doc. 45, ¶¶ 12, 18; Doc. 51, ¶¶ 12, 18). Trooper Knirnschild explained what had happened at his house earlier, and suggested a "302[-]proceeding." (Doc. 45, ¶ 13; Doc. 51, ¶ 13). Mr. Barkus indicated that he had tried that previously and his effort(s) were unsuccessful. (Doc. 45, ¶ 13; Doc. 51, ¶ 13). Defendant also contends that Mr. Barkus told him to be careful, and to treat Kristopher "like a bull in a china shop." (Doc. 46-1 at tr. pg. 38; Doc. 45, ¶ 13).

Mr. Barkus denies having so-stated, or indicating that Kristopher was in any way dangerous. (Doc. 51, ¶ 13; Doc. 54 at pg. 45 of 45).

**B.    The Events of June 6, 2014**

Defendant and Kristopher did not see each other again until the evening of June 6, 2014. That evening, Trooper Knirnschild was at home, sitting on the couch with two of his children and his wife, watching television. (Doc. 45, ¶ 26; Doc. 51, ¶ 26). His third child was playing on the floor. (<u>Id.</u>).

Defendant noticed his 18-month old daughter pointing to the front door. (Doc. 45, ¶ 27; Doc. 51, ¶ 27). He looked to the door and noticed his dog also looking. (<u>Id.</u>). Defendant got up and walked past the door. (Doc. 45, ¶ 28; Doc. 51, ¶ 28). From this point on, the parties' factual accounts differ.

1.    <u>Trooper Knirnschild's version of events</u>

Trooper Knirnschild testified that he noticed a figure outside his door, and because of the time of day, his dog's reaction, his daughter's reaction and the infrequency of uncalled visitors, he went to his bedroom, got his personal Taurus TCP-380 caliber handgun, and put it in his front-left pants pocket. (Doc. 45, ¶ 28). He then opened the front door and saw an individual facing away from him on his sidewalk, and another man in a car in his driveway. The man in the car was Kristopher's brother, Bobby Barkus, who had come looking for Kristopher after Kristopher left their house around 8:00 p.m. (<u>Id.</u>, ¶¶ 29-30, 44; Doc. 51, ¶ 44; Doc. 54-1 at pgs. 11 and 33 of 54). As Bobby drove on September Drive, he saw Kristopher knocking on Defendant's front door. (Doc. 45, ¶ 44). Bobby spoke to Kristopher from his car, and then pulled into Defendant's driveway. (<u>Id.</u>).

Defendant went to the steps leading to his porch, and asked the man what he was doing there.  (Id., ¶ 31).  At that point, Defendant recognized the man as Kristopher, the individual who previously had come to his home and asked to be arrested.  (Id., ¶¶ 31-32).  In response to Defendant's query, Kristopher turned around, took some steps toward Defendant and drew what appeared to be a semiautomatic handgun.  (Id., ¶ 33).  In fact, the gun was an "Airsoft pistol," but it lacked sufficient markings/indicia for Defendant to discern its inauthenticity.[1]

Kristopher raised the weapon as he spun around; he pointed it first at Defendant, and then pointed it to his own head.  (Id., ¶¶ 33-34).  Defendant told Kristopher to drop the gun.  (Id., ¶ 35).  At this time, the two men were approximately ten to fifteen feet apart, and Defendant could see his children in his peripheral vision in the window, only five feet from Kristopher.  (Id.).  Defendant, knowing how quickly the gun could be turned back on him or his children, drew his gun from his pocket, and, as he was drawing, told Kristopher a second-time to put down the gun.  (Id. at ¶ 37).  Kristopher did nothing, keeping the gun pointed at his head, and after seconds elapsed without Kristopher responding to the drop-order, Defendant fired several shots, aiming for center mass.  (Id., ¶¶ 37-38).  Defendant continued to fire at Kristopher until his handgun jammed.  (Id., ¶ 39).  According to Defendant, Kristopher maintained control of his weapon as he fell to the ground, and once down, pointed the pistol at Defendant.  (Id.).

Two of the bullets struck Kristopher on his right side. (Id., ¶ 40).  The remaining bullets did not hit Kristopher; they were stopped by the contents of his backpack.  (Id.).  Defendant fired a total of 5 shots, with the 6th round misfiring.  (Id.).

---

[1]  Trooper Knirnschild did not find out that the object was an air-gun until well after the fact. (Doc. 45, ¶¶ 33, n.2, 43).  Although there has been some disagreement regarding whether the air-gun had an "orange tip," *et cetera*, Plaintiffs do not argue on summary judgment that Defendant knew, or reasonably should have known, that the gun was not "real."

After Defendant ran out of ammunition, he went back into his house to get another weapon, because he believed Kristopher still was a threat, and because the other individual in the automobile in his driveway also was a potential-threat. (Id., ¶ 41). While inside, Defendant told his wife to call 911. (Id.). He retrieved his service weapon and went back outside. By then, Kristopher was gone, and Defendant saw the automobile that had been in his driveway speeding away. (Id.).

Neighbors immediately came over to check on Defendant;[2] and, shortly thereafter, Officer Palla from the Butler Township Police arrived on the scene. (Id., ¶ 42).

2. Plaintiffs' version of events

After being alerted by his daughter and his dog that someone was at his front door, Defendant looked through the window of the door, and saw a man walking away, who he recognized as Kristopher Barkus. Defendant stated "he's back again," and because seeing Kristopher made him uncomfortable, he went to get his personal handgun. (Doc. 51, ¶¶ 28, 91; Doc. 54 at pgs. 35-36 of 45). After getting his weapon, Trooper Knirnschild exited his house

---

[2] The Court agrees with Plaintiffs that Defendants' assertions regarding the alleged-statement(s) of Trooper Knirnschild's neighbor, "Bev," are inadmissible hearsay. (Doc. 51, ¶ 42) (citing Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801-802). In Fraternal Order of Police v. City of Camden, the Court of Appeals for the Third Circuit opined:

> [T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. . . .

Id., 842 F.3d 231, 238-39 (3d Cir. 2016) (internal quotations and footnotes omitted). Here, Defendants offer no explanation regarding the declarant's ability to testify at trial. Under the circumstances, the Court cannot rely on her purported statement(s).

and began yelling at Kristopher, "what are you doing here, I told you never to come back onto my property again." (Doc. 51, ¶ 31; Doc. 54-1 at pg. 54 of 54).

Prior to Defendant shouting at Kristopher, Kristopher had walked to the end of Defendant's sidewalk and reached the front passenger-side door of Bobby's vehicle, which was parked in the driveway. (Doc. 51, ¶¶ 29, 92; Doc. 54 at pgs. 35-36 of 45). Bobby had been looking for Kristopher, and had pulled into the trooper's driveway after he saw Kristopher knock on Defendant's door. (Doc. 54-1 at pg. 12 of 54). Once Defendant shouted at Kristopher, Kristopher left the passenger side of the car, walked in front of the car and stood on the sidewalk, close to where the sidewalk met the driveway. (Doc. 54-1 at pg. 14 of 54).

Defendant had a gun in his hand as he came down from the porch and onto the sidewalk. (Doc. 51, ¶ 35; Doc. 54-1 at pgs. 13 and 29 of 54). He yelled for Kristopher to "stop," and aimed his gun at him. (Doc. 51, ¶ 35; Doc. 54-1 at pg. 14 of 54). At this point, the distance between the two men was more than fifteen feet; blood droplets recorded at the scene place Kristopher approximately eighteen feet from Defendant when Defendant fired. (Doc. 51, ¶ 35; Doc. 54-2 at pg. 2 of 32). Kristopher was not in front of the window (where Defendant, allegedly, could see his family in his peripheral vision); he was closer to where the sidewalk met the driveway. (Doc. 51, ¶ 35; Doc. 54-1 at pgs. 23-24 of 54).

As Kristopher faced Defendant, who had his gun drawn, Kristopher calmly stated in a loud voice, "I need help." (Doc. 51, ¶ 96; Doc. 54-1 at pg. 14 of 54). Kristopher then pulled from his backpack the pistol and immediately placed it to the right side of his own head. (Doc. 51, ¶ 33; Doc. 54 at pg. 31 of 45; Doc. 54-1 at pg. 18 of 54). Defendant commanded Kristopher to "drop the gun," and almost immediately, without giving Kristopher time to react, Defendant fired. (Doc. 51, ¶¶ 37, 39; Doc. 54-1 at pgs. 26-27 of 54).

Upon being hit by the first shot, Kristopher fell to the ground, losing control of the air-gun as he fell.  (Doc. 51, ¶¶ 37, 39; Doc. 54-1 at pgs. 26-27 and 31-32 of 54).

Trooper Knirnschild continued to fire, even after Kristopher was on the ground, attempting to shield himself.  (Doc. 45, ¶ 40; Doc. 51, ¶ 40).

When Trooper Knirnschild stopped shooting, he threw his weapon to the ground, and ran back into his house.  (Doc. 51, ¶ 50; Doc. 54-1 at pg. 28 of 54).  Kristopher called out to Bobby, who helped him into the car, and Bobby rushed Kristopher to the local hospital.  (Doc. 45, ¶ 50; Doc. 51, ¶ 50).

### C.      The Detention of Bobby Barkus

#### 1.      Plaintiffs' version of events

Once they arrived at the hospital, Bobby got medical attention for Kristopher and eventually was sent to wait in a private room.  (Doc. 54-1 at pg. 35 of 54).  He was accompanied at some point by his mother, Mrs. Barkus.  (Id. at pg. 37 of 54) and Butler Police Officer Nick Shulik ("Officer Shulik").  (Doc. 51, ¶ 51; Doc. 54-1 at pg. 36 of 54; Doc. 54-2 at pg. 20 of 32).  Bobby told Officer Shulik what happened.  (Doc. 51, ¶ 51; Doc. 54-1 at pg. 36 of 54; Doc. 54-2 at pg. 21 of 32).  Bobby and his mother were told that Kristopher was going to be life-flighted to Pittsburgh, and Mrs. Barkus left the room to speak to Kristopher.  (Doc. 54-1 at pg. 37 of 54).  Once Mrs. Barkus left the room, Trooper Walker came into the room and handcuffed Bobby.  (Doc. 45, ¶ 51; Doc. 51, ¶ 51).  Trooper Walker then took Bobby to his police car and placed him in the back seat of the car.  (Doc. 45, ¶ 52; Doc. 51, ¶ 52).  Bobby repeatedly asked Trooper Walker, "[w]hy am I handcuffed," and "[w]hy are you taking me?"  (Doc. 54-1 at pg. 40 of 54).  Trooper Walker replied that it was for his own good and that it was protocol.  (Doc. 45, ¶ 52; Doc. 51, ¶ 52).  Trooper Walker then returned to the hospital to continue his investigation of the

case. (Doc. 45, ¶ 72). After forty-five minutes, Sergeant Herr (who, at the time of the shooting, was a corporal) entered the police-vehicle Bobby was being held in, and drove Bobby to the state police barracks. (Doc. 45, ¶¶ 52-53, 58; Doc. 51, ¶¶ 52-53).

After they arrived at the barracks, around 10:00 p.m., Sergeant Herr handcuffed Bobby's hands and legs to a security bench. (Doc. 45, ¶ 53; Doc. 54-1 at pg. 44 of 54). Bobby remained attached to the bench for between one-and-a-half hours to an hour and forty-five minutes. During this time Bobby asked to speak to his parents and to his attorney, but his requests were denied. (Doc. 45, ¶ 54; Doc. 51, ¶ 54). Sergeant Herr was in the vicinity of Bobby while he was attached to the security bench. (Doc. 54-2 at pg. 15 of 32). At approximately 11:30 p.m., Bobby was approached by Sergeant Sarnese, who asked Bobby if he was willing to talk. (Doc. 45, ¶ 55; Doc. 51, ¶ 55). Bobby agreed to speak to the troopers only if Kristopher was alive. (Doc. 45, ¶ 55; Doc. 51, ¶¶ 55, 127, Doc. 54-1 at pg. 46 of 54). Sergeant Sarnese told Bobby that Kristopher was still alive. (Doc. 51, ¶ 128; Doc. 54-1 at pg. 46 of 54). In fact, Kristopher had died at 10:31 p.m., and Trooper Wetzel and Corporal Anderson were aware of this fact. (Doc. 51, ¶ 129; Doc. 54-2 at pg. 30 of 32).

Once Bobby agreed to talk, his hands were un-cuffed and he was taken to an interview room, where he was told by Trooper Taylor that, because he was brought to the barracks in handcuffs, "technically you're not free to leave," and he needed to read Bobby his Miranda rights. (Doc. 54-2 at pg. 28 of 32). Bobby was questioned by Sergeant Sarnese and Trooper Taylor from approximately 11:45 p.m. until 1:45 a.m. (Doc. 45, ¶ 56; Doc. 51, ¶ 56; Doc. 54-2 at pg. 28 of 32). Bobby asked to stop the interview because the officers would not give him an update on Kristopher's condition; the police said no, and asked him additional questions. (Doc. 45, ¶ 57; Doc. 51, ¶¶ 57, 131; Doc. 54-1 at pgs. 49 and 51 of 54). The police then ended

the interview, Bobby was told that his aunt, an attorney, was waiting for him, and Bobby was driven home. (Doc. 45, ¶ 57; Doc. 51, ¶ 57; Doc. 54-1 at pgs. 49 and 51 of 54). Due to Bobby's detention, he was not with Kristopher or his family when Kristopher died. (Doc. 51, ¶ 133; Doc. 54-1 at pg. 36 of 54).

2.    <u>Defendants' version of events</u>

Trooper Walker was working the 2:00 p.m. to 10:00 p.m. shift, when he heard over the radio that there was incident on September Drive involving a gun and two actors, one of which had been shot and fled in a grey Volvo. (Doc. 46-6 at tr. pg. 14). Trooper Walker then heard over the radio that the actors were at Butler Memorial Hospital, so he headed there. (<u>Id.</u>). Upon entering the hospital, he encountered Officer Shulick, who pointed to the family room as if to say "he's in there." (<u>Id.</u> at tr. pg. 17). Trooper Walker entered the family room and saw Bobby Barkus, who was dressed in a t-shirt and pajama-like pants. (<u>Id.</u> at 17-18). Trooper Walker observed that there were no weapons in the room or on Bobby's person. (<u>Id.</u> at 18). He asked Bobby who he was, and Bobby responded appropriately. (<u>Id.</u>). Trooper Walker observed Bobby to be emotionally-charged and distraught, and he tried to calm him down. (<u>Id.</u>).

Trooper Walker was instructed by Sergeant Sarnese to bring Bobby to the state police barracks. (<u>Id.</u> at 28). Trooper Walker asked Bobby to come to the barracks, and Bobby agreed. (<u>Id.</u> at 20, 22, 28). Bobby had the option of not getting into the trooper's car. (<u>Id.</u> at 22). "[T]here [were] no explicit or implicit movements or words to say, 'No, I'm not going.' There was nothing overt or subtle . . . – he didn't pull away when I went to put him in the car. He wanted to tell his story. He was upset. I felt that he wanted to tell people, 'This is what happened,' and we needed to know." (<u>Id.</u> at 28).

Trooper Walker does not believe Bobby would have been restrained walking to the police car, nor does he remember Bobby being handcuffed. (Id. at 20). Once Bobby was in the vehicle, he would have been handcuffed. (Id. at 20, 23). It was protocol, at the police officer's discretion. (Id. at 46). Trooper Walker handcuffed Bobby because he was an unknown subject who was very distraught, emotionally-charged and had been involved in a serious incident. (Id.). "We [didn't] know what his role was, but he agreed to come to the barracks and talk about it." (Id.).

Trooper Walker either walked Bobby to the car himself, or told another officer to do so. (Id. at 21-22). He would have had to have been at the car to unlock it so that Bobby could be placed inside. (Id. at 45). Trooper Walker then spoke to the attending physician at 9:30 p.m., who explained that Kristopher had been shot at least twice in the abdomen. (Id. at 24). Hospital personnel gave Trooper Walker a bag with Kristopher's clothes, and Trooper Walker left for the Butler state police barracks with Bobby in the back seat. (Id. at 25).

Trooper Walker brought Bobby into the patrol room, placed him on the prisoner security bench, gave the bag of Kristopher's clothes to Sergeant Sarnese, and then his shift was over. (Id. at 29). He does not remember handcuffing Bobby, or whether Bobby was handcuffed or leg-shackled to the bench. (Id.). Trooper Walker found Bobby to have been fully cooperative. (Id. at 23).

Sergeant Herr did not recall driving Bobby Barkus from the hospital to the barracks, nor did he believe he drove Bobby to the barracks, "but [he couldn't] be 100-percent certain." (Doc. 46-5 at tr. pg. 11). He remembered Bobby being in the station, on the second floor where the offices were located, secured to a bench in one of the offices. (Id. at 12-13). Sergeant Herr had little interaction with Bobby at the station. (Id. at 14-15).

Sergeant Herr prepared the search warrants for the Barkus and Knirnschild residences, as well as for the vehicle Bobby drove in connection with the incident. (Id. at 9-10). Once prepared and sign by a judge, Sergeant Herr took the search warrants to the respective residences and assisted in the search of Trooper Knirnschild's residence. (Id. at 15).

### D.      Expert Reports

The record contains two expert reports. Plaintiffs rely on the expert report of R. Paul McCauley, Ph.D., FACFE. Dr. McCauley's report concludes, among other things: that Trooper Knirnschild should not have exited from the protection of his dwelling; his approaching Decedent with a firearm "created an unnecessary danger and an unnecessary split-second deadly force . . . situation"; Defendant instead should have "open[ed] the door and ask[ed Decedent] what he wanted," which would have been consistent with police procedures in dealing with an "EDP" (i.e., an emotionally disturbed person); in dealing with an EDP, Defendant should have called 911 to initiate a local-police response; and, had Defendant simply "followed generally accepted off-duty and EDP policies," the incident of deadly-force was avoidable. (Doc. 54 at pgs. 23-24 of 45). Plaintiffs' report is accompanied by a declaration of the expert, sworn under penalty of perjury. (Doc. 54 at pgs. 3-4 of 45).

The report of Defendant's expert, Cliff Jobe, addresses: (1) the capabilities of the type of air-gun involved in the incident; (2) the time it takes an average person to adjust the direction of a gun barrel; and (3) the average reaction time of a police officer "to perceive an action, analyze the action as a threat" and determine and undertake appropriate countermeasure(s). (Doc. 45, ¶¶ 78-81; Doc. 46-7 at internal pg. nos. 22, 24-25). Mr. Jobe's report is not accompanied by an affidavit or declaration. (See id.).

## ANALYSIS

### A. The Claims Against the "John Doe" Defendants Will Be Dismissed.

Under Federal Rule of Civil Procedure 21, "on motion or on its own, the [C]ourt may at any time, on just terms, add or drop a party." Id. Discovery has closed, and Plaintiffs have not substituted, or served the pleadings on, any additional parties-in-interest. Thus, the John Doe Defendants properly are dismissed. See Blakeslee v. Clinton County, 336 F. App'x 248, 250 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities, . . . the John Doe defendants must be dismissed") (citations omitted); Williams v. Lower Merion Tp., 1995 WL 461246, *6 (E.D. Pa. Aug. 2, 1995) (holding same on summary judgment).

### B. Defendants' Expert Report Cannot Be Considered.

Defendant's expert report cannot be considered on summary judgment because is it unaccompanied by an appropriate affidavit or declaration. See Fowle v. C&C Cola, 868 F.2d 59, 67 (3d Cir. 1989) (where "[t]he substance of [an expert] report was not sworn to by the alleged expert," the report was "not competent to be considered on a motion for summary judgment") (citation omitted). "[W]hile evidence should not be excluded on summary judgment on hypertechnical grounds," Defendants' failure to correct the error, once-identified by Plaintiffs' counsel, warrants preclusion. Id. Finally, even if Defendants' expert report properly could be considered, it would not alter the Court's determinations. See discussions infra.

### C. The Fourth Amendment Claim against Trooper Knirnschild

The Estate claims that Trooper Knirnschild violated Decedent's Fourth Amendment right to be free from excessive force. In Johnson v. City of Philadelphia, the Court of Appeals for the Third Circuit summarized the excessive-force inquiry:

[Scott v. Harris, 550 U.S. 372 (2007)] abrogates our use of special standards in deadly-force cases and reinstates reasonableness as the ultimate − and only − inquiry. Whether or not [an officer's] actions constituted application of deadly force, all that matters is whether [the officer's] actions were reasonable. This is not to say that the considerations enumerated in [Tennessee v. Garner, 471 U.S. 1 (1985)] are irrelevant to the reasonableness analysis; to the contrary, in many cases, . . . a proper assessment of the threat of injury or the risk of flight is crucial to identifying the magnitude of the governmental interests at stake. But such considerations are simply the means by which we approach the ultimate inquiry, not constitutional requirements in their own right.

The reasonableness of a seizure is assessed in light of the totality of the circumstances. We analyze this question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, making allowance for the fact that police officers are often forced to make split-second judgments − in circumstances that are tense, uncertain, and rapidly evolving − about the amount of force that is necessary in a particular situation.

Id., 837 F.3d 343, 349-50 (3d Cir. 2016) (footnotes and internal quotations omitted).

Defendants argue that, under the totality of the circumstances, Trooper Knirnschild's "belief that [Decedent] was armed and dangerous cannot be reasonably questioned," and, thus, he acted reasonably. (Doc. 47 at 10-11) (citing Lamont v. New Jersey, 637 F.3d 177 (3d Cir. 2011)). Alternatively, Defendants contend that, even if Trooper Knirnschild acted unreasonably, he is entitled to qualified immunity because he did not violate clearly-established law. (Doc. 47 at 12).

Plaintiffs respond that, viewing the evidence in a light most favorable to them, Defendant's use of deadly force was objectively unreasonable. (Doc. 52 at 8-11) (citing Bennett v. Murphy, 120 F. App'x 914 (3d Cir. 2005) ("Bennett III") and Williams v. Papi, 2016 WL 7155988 (M.D. Pa. Dec. 7, 2016), dismissed in part and rev'd in part on other grounds, 2017 WL 4812552 (3d Cir. Oct. 25, 2017)). Plaintiffs argue that the use of deadly force was unreasonable because: (1) at worst, Decedent was engaged in minor-trespass; (2) he was about to leave Defendant's property when Defendant confronted him, gun drawn; (3) Defendant easily

could have retreated into his house; (4) Plaintiffs' expert, Dr. McCauley, concluded that Defendant's confrontation with a known emotionally-disturbed-person violated police procedure; (5) Trooper Knirnschild knew, from his earlier encounter with Decedent, that he had been compliant, leaving when told; and (6) prior to the incident, Decedent "had only indicated he wanted [Defendant's] help." *See* discussions *supra*.

Plaintiffs also contend that, even if Trooper Knirnschild's initial firing upon Decedent was reasonable, a jury properly may conclude that Defendant's continued use of deadly force, after he fell to the ground and dropped his pistol, was unreasonable. Plaintiffs draw analogy to the Lamont Court's ruling that, "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." (Id. at 15-16) (citing Lamont, 637 F.3d at 184).

Plaintiffs also argue that Defendant's conduct violated "a clearly-established constitutional right to be free from excessive force." (Id. at 17). Plaintiffs contend that the facts in this case are materially similar to those in Bennett III.

The Court finds that, reading the evidence in a light most favorable to Plaintiffs, a jury reasonably could find Defendant's initial shooting of Decedent was objectively unreasonable. In so ruling, the Court relies on the (admittedly disputed) facts that Decedent never pointed his pistol at Defendant; Defendant shot Decedent while the pistol was pointed at Decedent's own head; and Defendant gave no warning that he was going to shoot and/or gave Decedent insufficient opportunity to respond. See, e.g., Howard v. Bullock, 2011 WL 1103863, *2 (E.D. Pa. Mar. 24, 2011) (denying summary judgment under similar circumstances). A jury likewise may conclude that Defendant's continued-shooting after Decedent fell to the ground was objectively unreasonable.

Having so found, the Court must determine whether Defendant enjoys qualified

immunity.  As the Supreme Court recently explained:

> "Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. . . .
>
> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be settled law, . . . which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority . . . .  It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. . . .  Otherwise, the rule is not one that every reasonable official would know. . . .
>
> The clearly[-]established standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . .  This requires a high degree of specificity. . . .  We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances . . . .

Dist. of Columbia v. Wesby, − U.S. −, 138 S. Ct. 577, 589-90 (Jan. 22, 2018) (citations and most

internal quotations omitted; some alterations in original, and some added).

In White v. Pauly, the Supreme Court addressed qualified-immunity within the context of

"an officer who − having arrived late at an ongoing police action and having witnessed shots

being fired by one of several individuals in a house surrounded by other officers − sh[ot] and

kill[ed] an armed occupant of the house without first giving a warning."  Id., − U.S. −,

137 S. Ct. 548, 549 (2017).  In reversing a denial of summary judgment, the Court explained:

> The [circuit court] panel majority misunderstood the "clearly established" analysis:  It failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.  Instead, the majority relied on [judicial decisions that] lay out excessive-force principles at

only a general level. Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, . . . but[,] in the light of preexisting law[,] the unlawfulness must be apparent . . . .

Id. at 552.

The question here is whether any cases have been identified "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment"; or, alternatively, whether this is one of "[those] rare obvious cases where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." Wesby, 138 S. Ct. at 590. The lone comparator-case identified by Plaintiffs is Bennett III, cited *supra*. As an unpublished opinion, Bennett III is non-binding. See In re Grand Jury Investigation, 445 F.3d 266, 276 (3d Cir. 2006). Thus, the decision "is incapable of clearly establishing law for qualified-immunity purposes." Trotter v. Shull, 2017 WL 6492636, *2 (11th Cir. Dec. 19, 2017) (holding same, as relates to unpublished decisions). Even were the Court to conclude otherwise, the decision is distinguishable.

In Bennett III, the Court considered whether a defendant-trooper was entitled to qualified immunity where he shot and killed "an armed distraught man who, although refusing to drop his weapon over the course of an hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at the time he was shot." Id., 120 F. App'x at 918. The Court concluded that the officer was not entitled to qualified immunity because:

[I]t [was not] indisputably reasonable as a matter of law for a law enforcement officer 80 yards away; at night; under conditions of poor visibility; to shoot someone who is standing still; facing away; with a gun pointed at his own head; threatening suicide; surrounded by heavily armed fellow officers in close proximity; out of fear of a threat to other troopers positioned at one third the distance; who were in a much better position to see the decedent; and who did not shoot; after almost an hour had passed with no offensive action by the state police.

18

Id. at 916. The Court further determined that the defendant-officer was not entitled to qualified immunity because the decedent's right was clearly established "and because . . . the facts alleged by [the plaintiff] disclose[d] no basis from which to conclude that [the decedent] posed an immediate threat to anyone but himself." Id. at 918. Under the circumstances, the Court found the case to be one "in which the general constitutional rule already identified in decisional law . . . appl[ied] with obvious clarity to the specific conduct in question." Id. (quoting U.S. v. Lanier, 520 U.S. 259, 271 (1997)).

The decisional law to which the Bennett III-opinion referred is the Supreme Court's decisions in Graham v. Connor, 490 U.S. 386 (1989), holding that "the use of force by police is subject to the Fourth Amendment and its 'reasonableness standard,'" and Garner, *supra*, where the Supreme Court made clear that "the use of deadly force by an officer is constitutionally unreasonable . . . unless [the] suspect poses an immediate threat of physical harm to police or others." Id., 120 F. App'x at 916. In so holding, the Court distinguished a number of other cases cited by the defendant, because in the case before it, the officer "acted precipitately at a time and under circumstances totally lacking in the urgency posed by [the comparator] cases." Id. at 919. The Court therefore concluded, on the record before it, that "any reasonable officer would understand without reference to any other case law that *Graham* and *Garner* prohibited [the] shooting." Id.

As to the initial shooting in this case, the Court concludes, contrary to Plaintiffs' contention, that Bennett III is materially *dissimilar*. Bennett III involved a suicidal individual holding a single-shot shotgun vertically towards his head; who had been engaged in an uneventful hour-long standoff with numerous members of law enforcement; when, in response to the decedent walking towards officers that were located twenty to twenty-five yards from the

decedent − but then stopping − the defendant officer, who was located eighty yards behind the decedent, without warning, fatally shot the decedent out of a claimed-concern for the safety of the more closely located officers, who themselves were not concerned with their safety. The circumstances described by Plaintiffs here – a rapidly-unfolding scenario in which Trooper Knirnschild was alone and facing Decedent, who brandished a firearm while standing approximately six yards away – are, in the Court's view, plainly and obviously distinguishable.[3]

Even assuming Defendant's conduct *leading up to* the shooting unreasonably caused an otherwise-avoidable use of lethal force, no controlling case law existed at the time of the incident to overcome the qualified-immunity bar.  See Wilson v. Bellmawr, 2016 WL 7377114, *13 (D. N.J. Dec. 20, 2016) (referencing *emerging*, rather than established, standards regarding law enforcement officers' potential need to take reasonable efforts to avoid or deescalate safety risks, and finding such standards "[not] clearly established" for qualified-immunity purposes).

Finally, with respect to Plaintiffs' contention that Defendant's conduct violated police regulations, the Supreme Court has made clear that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violate[d] some statutory or administrative provision."  Davis v. Scherer, 468 U.S. 183, 194 (1984) (footnote omitted); accord Gagne v. City of Galveston, 805 F.2d 558, 559 (5th Cir. 1986) (violation of a police department regulation "could not by itself deprive [the defendant police officer] of the protection of qualified immunity").  Nor can the Court conclude that the evidence, even read in a light most

---

[3] While Plaintiffs suggest that the only differences were the urgency, distance and duration of the perceived threat, *cf.* (Doc. 52 at 18), this is akin to saying a sports team had a great year, aside from its poor offense and defense performances.  The Court cannot properly discount those factors most central to a reasoned-comparison.  Furthermore, the undersigned's independent research has failed to uncover other comparator-cases with facts analogous to the evidence presented.  At bottom, neither precedential authority nor a robust consensus of persuasive authority supports Plaintiffs' position.

favorable to Plaintiffs, qualifies under the standards governing those "rare obvious case[s] where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." Wesby, 138 S. Ct. at 590.

Trooper Knirnschild is entitled to qualified immunity as to the initial-shooting, and Defendants' Motion for Summary Judgment is well-taken to that extent. The same cannot be said, however, regarding Trooper Knirnschild's continued shooting after Decedent (allegedly) fell to the ground and dropped his pistol. This is so pursuant to the binding precedent in Lamont v. New Jersey, 637 F.3d 177 (3d Cir. 2011). There, the defendant-troopers fired on a fleeing suspect when they saw him pull his hand out of his waistband, as if pulling a gun; the defendants continued shooting at the suspect even after seeing that his hand, in fact, was empty. Id. at 184. On these facts, the Court of Appeals for the Third Circuit opined:

> Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished. . . . [A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased . . . . [F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated. . . . When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.

Id. (citations and internal quotations omitted, emphasis added).

Even when Lamont was decided, "there [was] sufficient precedent . . ., factually similar to the plaintiff's allegations, to put defendant[s] on notice that his or her conduct [wa]s constitutionally prohibited." Mammaro v. New Jersey Div. of Child Protection & Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (succinctly stating test for qualified immunity) (citation to quoted source omitted); see also, e.g., Monticciolo v. Robertson, 2017 WL 4536119, *15 (D. N.J. Oct. 11, 2017) ("it was clearly established, at the time of [the] use of force, that even if

an individual posed a threat at the time force was initiated, the officer may not continue to use such force after it has become evident that the threat justifying the force has vanished").

The Lamont decision gave Trooper Knirnschild "fair warning" that the continued shooting of Decedent, after he fell to the ground and dropped his weapon, was in violation of the Fourth Amendment. To the extent that the Estate's claim is based on this conduct, then, qualified immunity does not apply, and Defendant's Motion for Summary Judgment must be denied.[4]

**D.      Bobby Barkus's Fourth Amendment Claim**

Bobby Barkus alleges that Defendants Herr and Walker violated his right to be free from unreasonable seizure when, without a warrant or probable cause for arrest, they handcuffed him at the hospital; placed him in a police vehicle for forty-five minutes; took him to the state police barracks; left him handcuffed to a bench for over an hour; and then questioned him for two hours before release. (Doc. 26, ¶¶ 222-28).

On summary judgment, Defendant Herr argues that his involvement in the incident essentially was limited to "preparing warrants and assisting in the search of Knirnschild's property. Although Bobby Barkus asserts [that] he read his name tag, and thus knows it was Herr who drove him from the hospital[,] he is clearly wrong. Indeed, [D]efendant Walker freely admits to being the state trooper who drove Bobby from the hospital to the barracks.

---

[4] To be sure, a jury may determine that so little time passed between Defendant's first and subsequent shots that he was not-unreasonable in continuing to fire until he was certain that the perceived-threat was neutralized. The Court offers no opinion in this regard, and merely holds that Lamont and its progeny provide a legal theory sufficiently-established for the purposes of qualified immunity.

No reasonable juror, in the face of the admission by Walker, Bobby's fraught state, and Herr's documented work on the warrants, could find otherwise." (Doc. 47 at 18).

Defendants further argue, collectively, that they did not treat Bobby as a criminal suspect, and therefore, "it is not appropriate to view his time at the barracks through the same lens as a suspect being held pursuant to an intention to file charges." (Id.). Instead, Defendants contend, Bobby was treated as a detained material-witness, and, thus, the inquiry should focus on whether his seizure was "reasonable within the Fourth Amendment's meaning," which requires balancing Bobby's liberty interest against the government's interest in public safety. Id. (citing Schneyder v. Smith, 653 F.3d 313 (3d Cir. 2011)). In their view, "the need to properly investigate a shooting death involving a state trooper justif[ied] the temporary discomfort Bobby" endured. (Id. at 21). Defendants further argue that, even if their actions technically violated Bobby's rights, they are entitled to qualified immunity under the circumstances-described. (Id.).

Plaintiffs respond:

[Bobby] was seized for a total of approximately four and a half hours, much longer than the 90-minute duration found unconstitutional in Walker v. City of Orem, 451 F.3d 1139, 1149 (10th Cir. 2006). During that time period, Kristopher died, and Defendants knew it. Yet, when Bobby . . . agreed to speak with officers on the condition that his brother was still alive, he was falsely told Kristopher still lived and was then further told he was not free to leave in any event. Troopers also continued to question Bobby after he asked to terminate the interview. All of this occurred in the context that Bobby had a cooperative demeanor, he was obviously not a flight risk, and the troopers knew where he lived. Additionally, [Mrs.] Barkus had told Trooper Walker at the hospital that he could speak to Bobby the following day, the inference being that Bobby would be available and willing to talk to troopers. And ultimately, because of the seizure, Bobby was not with his brother and family when Kristopher passed.

(Id.).

With respect to Defendant Herr's involvement, Bobby testified that Herr was the one who drove him to the police station and handcuffed him to the security bench at the police station.

(Doc. 45, ¶¶ 52-53, 58; Doc. 51, ¶¶ 52-53). While the Court may question the accuracy of these assertions/recollections, it disagrees with Defendants that this falls within "no reasonable juror" territory.

Moreover, the Court concludes that the detention of a witness by law enforcement may rise to the level of being a *de facto* arrest; and that, absent consent, a warrant for arrest or probable cause, such detention may violate the Fourth Amendment's prohibition against unreasonable seizures. See Lincoln v. Barnes, 855 F.3d 297, 302 (5th Cir. 2017) (holding same); Centanni v. Eight Unknown Officers, 15 F.3d 587, 591 (6th Cir. 1994) (holding same regarding analogous conduct). The Court agrees with Plaintiffs, then, that Defendants have not shown entitlement to summary judgment under the objective-reasonableness standard.

Furthermore, under the Supreme Court precedent in Davis v. Mississippi, 394 U.S. 721 (1969) and Dunaway v. New York, 442 U.S. 200 (1979), "an investigatory detention that, for all intents and purposes, is indistinguishable from custodial interrogation, requires no less probable cause than a traditional arrest." Lincoln, 855 F.3d at 302 (citing same). Clearly-established law recognizes Bobby's legal claims, and Defendants are not entitled to qualified immunity.

### E.     The State Law Claims

Defendants request summary judgment based on sovereign immunity. Plaintiffs' allegation that Defendants acted under "color of law" does not control. Zion v. Nassan, 283 F.R.D. 247, 267-68 (W.D. Pa. 2012) (holding same, citations and internal quotations omitted). Rather, the legal standards are well-summarized in Lockhoff v. Slonaker:

> Under Pennsylvania law, except insofar as they do not act within the scope of their employment, state employees . . . are entitled to sovereign immunity. . . . The [Court of Appeals for the] Third Circuit has predicted that Pennsylvania would apply Section 228 of the Restatement (Second) of Agency to determine whether actions are within the scope of an official's employment. . . .

Under the Restatement, conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master. . . .

Activity may be within the scope of employment even if the acts are intentional or criminal, and even unauthorized acts may be within the scope of employment if they are clearly incidental to the master's business. . . . However, in the context of law enforcement-related claims, [w]here the alleged intentional tort was unprovoked, unnecessary or unjustified by security concerns or penological goals, courts have ruled that such conduct does not, as a matter of law, fall within the scope of employment. . . .

Id., 2017 WL 2423790, *14 (E.D. Pa. June 5, 2017) (citations to binding authority and internal quotations omitted); accord Hickenbottom v. Nassan, 2007 WL 7753803, *43 (W.D. Pa. Mar. 29, 2007) (intentional conduct is "unexpectable by the master[, and actionable,] when it is done in a whimsical or outrageous manner") (citation to quoted source omitted).

As to the state-court claims against Trooper Knirnschild, the Court already has held that, viewing the evidence in a light most favorable to Plaintiffs, a jury reasonably could conclude that Defendant's shooting of Decedent was objectively unreasonable. It follows, then, that the conduct may be seen as sufficiently outrageous and "unexpectable by the master" that sovereign immunity does not apply. Accordingly, Defendants' Motion for Summary Judgment will be denied regarding the state-law claims against Trooper Knirnschild (Counts III, IV, VIII and IX).

The same cannot be said, however, regarding the state-law claims against the remaining Defendants. Even viewing the evidence in a light most favorable to Plaintiffs, the conduct of Defendants Herr and Walker cannot be viewed as falling outside the scope of their employment, as that phrased is defined in the law. Defendant's Motion, therefore, will be granted on those claims (Counts VI and VII).

Consistent with the foregoing, the Court hereby enters the following:

## II. <u>ORDER</u>

Defendants' Motion for Summary Judgment (**Doc. 44**) is **GRANTED** as to Counts II, VI and VII; **GRANTED** as to Count I, to the extent it is premised on Trooper Knirnschild's initial shooting of Decedent, but not as relates to Defendant's subsequent conduct; and otherwise **DENIED**.  Also, the claims against the **John Doe Defendants** are **DISMISSED**.

IT IS SO ORDERED.


March 9, 2018                                                    s/Cathy Bissoon
                                                                Cathy Bissoon
                                                                United States District Judge

cc (via ECF email notification):

All Counsel of Record